# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) Criminal Action No. 10-224 (RMC) |
| NEIL CAMPBELL, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Neil Campbell is an Australian citizen who was a senior construction manager associated with the International Organization for Migration ("IOM") in Afghanistan, working on contracts funded by the U.S. Agency for International Development ("USAID"). He is charged in a one-count Indictment with solicitation of a bribe by an agent of an organization receiving more than $10,000 in federal funds, a violation of 18 U.S.C. § 666(a)(1)(B) ("§ 666"). He moves to dismiss the Indictment, arguing, in part, that § 666 does not extend beyond the domestic boundaries of the United States to his alleged criminal conduct in Afghanistan. Mr. Campbell's motion raises a most intriguing question of accommodating two distinct lines of analysis from the Supreme Court: one, in a criminal context, was set out in 1922, has never been overturned, and would arguably allow this prosecution; the second, mostly in a civil context, has been most emphatically proclaimed in recent years and would arguably bar it. Not surprisingly, the Government would hold the law to the benchmark set in 1922, under which its prosecution meets statutory and constitutional measures.

As a lower court, this Court cannot ignore what neither the Supreme Court nor the D.C. Circuit has declared outmoded. Mr. Campbell's remedy, if any, must come from elsewhere.

His motion will be denied.

## I. FACTS ALLEGED

The following factual allegations are taken from the Indictment. *See* Indictment [Dkt. # 6]. As relevant, IOM is an intergovernmental organization that is providing healthcare and educational support to the Afghani government, working with the Afghanistan Ministries of Public Health and Education to construct hospitals, midwifery training schools and provincial teacher training colleges. USAID is an independent federal governmental agency. It is the principle U.S. agency that extends assistance to foreign nations to support U.S. foreign policy objectives by supporting economic growth, agricultural development, conflict prevention, global health, and development relief. Since 2002, USAID has provided more than $260 million to IOM for reconstruction efforts in Afghanistan through five contracts known as cooperative agreements.

Mr. Campbell has worked with IOM since January 2009 as a senior construction manager in Afghanistan. He devoted his attention to the USAID-sponsored Construction of Health and Education Facilities ("CHEF") program pursuant to cooperative agreement #306-A-00-08-00512 between USAID and IOM. Mr. Campbell was also a member of a panel that selected subcontractors for various CHEF construction projects. On or about May 25, 2010, IOM awarded two subcontracts from the CHEF program to subcontractor ABC ("ABC"), a construction company in Afghanistan. The first subcontract was worth $13,470,947.65 for the construction of a hospital in Afghanistan. The second subcontract awarded to ABC was worth $1,950,187.00 for the construction of a provincial teacher training college in Afghanistan.

The Indictment alleges that on or about July 7, 2010, Mr. Campbell met in Kabul, Afghanistan with an undercover investigator from the USAID Office of Inspector General, who was

posing as a representative of ABC.  Mr. Campbell requested a one-time cash payment of $190,000 in United States currency to allow ABC to continue to work on the hospital and college projects. Allegedly, Mr. Campbell stated that he "got [ABC] $14 million worth of work" and "one hundred and ninety thousand dollars is nothing for the risk I am taking."  Indictment ¶ 7 (Count 1).  Mr. Campbell told the undercover investigator that he preferred a cash payment to a wire transfer because he wanted to elude law enforcement.  He allegedly stated that "people [that] do what I do, they, you know, I'm 60 years old.  I don't need to do 10 years in jail, that's the end of my life."  *Id*. ¶ 8.  The undercover investigator asked about future subcontracts that Mr. Campbell could obtain for ABC, and Mr. Campbell responded, "We'll have to wait for USAID to give us the money."  *Id*. ¶ 9.  The meeting concluded with Mr. Campbell agreeing to meet the undercover investigator again in approximately six weeks to accept the one-time cash payment.  Mr. Campbell insisted that the next meeting transpire at night because it would be dark.

The Indictment further alleges that on or about August 5, 2010, Mr. Campbell again met with the undercover investigator, who explained that he had encountered difficulties securing the entire $190,000 payment, and offered Mr. Campbell $10,000 in U.S. currency in cash as a good faith payment.  Mr. Campbell accepted the $10,000 payment, counted the bills, and directed that the remaining payment of $180,000 be made in a single lump-sum payment.  Mr. Campbell explained, "[T]he thing goes likewise, you know, I'm making some money, but also I'm making, um, the guy at USAID and [IOM] and the people of Afghanistan a very good product."  *Id*. ¶ 12.  For the next and final payment, Mr. Campbell instructed the undercover investigator that, rather than call, he should send Mr. Campbell a text message with the specific message:  "I have some nice coins for you to look at."  *Id*. ¶ 13.  Mr. Campbell also instructed the undercover investigator to "go out and

buy a ten dollar briefcase and put [the $180,000] in the ten dollar brief case" for Mr. Campbell. *Id.*

Accordingly, the Indictment alleges that "[o]n or about May 25, 2010 and continuing through on or about August 5, 2010, in Kabul, Afghanistan, CAMPBELL did corruptly solicit, demand, accept and agree to accept a thing of value, that is $190,000 in United States currency, from Undercover [investigator], intending to be influenced and rewarded in connection with a transaction and series of transactions of USAID involving $5,000 or more" in violation of 18 U.S.C. § 666(a)(1)(B). *Id.* ¶ 14.

The United States initiated sealed criminal proceedings against Mr. Campbell by filing a criminal complaint on July 23, 2010,[1] and the Indictment followed on August 19, 2010. The case was unsealed on October 12, 2010. Mr. Campbell was arrested in India on February 11, 2011, and thereafter brought to the United States for prosecution. The Indictment contains one count under 18 U.S.C. § 666(a)(1)(B)[2] and a claim for criminal forfeiture under 18 U.S.C. § 981(a)(1)(C) and 28

---

[1] The criminal complaint alleged that Mr. Campbell violated 41 U.S.C. § 53 (soliciting a kickback) and 18 U.S.C. § 666(a)(1)(B), *see* Criminal Compl. [Dkt. # 1], but Mr. Campbell was only indicted under § 666.

[2] In relevant part, the statute reads:

§ 666. Theft or bribery concerning programs receiving Federal funds

(a) Whoever, if the circumstance described in subsection (b) of this section exists–
   (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof–
   (A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that–
      (i) is valued at $ 5,000 or more, and
      (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or
   (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded

U.S.C. § 2461(c). Mr. Campbell moved to dismiss the Indictment on May 23, 2010, and following

oral argument on July 15, 2011, the motion is now ripe for decision.

## II. LEGAL STANDARD

A motion to dismiss challenges the adequacy of the indictment on its face. A

defendant may move to dismiss an indictment on the grounds that it "fails to invoke the court's

jurisdiction or to state an offense." Fed. R. Crim. P. 12(b)(3)(B). In ruling on a motion to dismiss,

a court views the indictment as a whole and assumes its factual allegations to be true. *Boyce Motor*

---

in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $ 5,000 or more; or
    (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $ 5,000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $ 10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

(c) This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

(d) As used in this section–
    (1) the term "agent" means a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative;
    . . . . .
    (5) the term "in any one-year period" means a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after the commission of the offense. Such period may include time both before and after the commission of the offense.

*Lines v. United States*, 342 U.S. 337, 343 n.16 (1952); *see also United States v. Ferris*, 807 F.2d 269, 271 (1st Cir. 1986). The question is usually whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed. *United States v. Sampson*, 371 U.S. 75, 76 (1962).

In this case, however, Mr. Campbell's first three challenges to the Indictment steer clear of its factual allegations, except as to their locus. Rather, he contends that the criminal statute at issue, § 666, does not reach his conduct occurring outside the domestic boundaries of the United States and, therefore, the Indictment must be dismissed because all alleged events happened in Afghanistan. Mr. Campbell further argues that his prosecution violates his rights to due process and transgresses customary international law. These arguments implicate the merits of Mr. Campbell's prosecution and not the Court's subject-matter jurisdiction. *See United States v. Delgado-Garcia*, 374 F.3d 1337, 1341–43 (D.C. Cir. 2004) (criminal prosecution); *Morrison v. Nat'l Australian Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010) (civil litigation). The Court maintains original jurisdiction under 18 U.S.C. § 3231, which vests original jurisdiction in the district courts over all offenses against the laws of the United States. *See* 18 U.S.C. § 3231. In the end, the "district court's subjectmatter jurisdiction . . . include[s] the power to decide whether the indictment charged a proper 'offense.'" *Delgado-Garcia*, 374 F.3d at 1342.

### III. LEGAL ANALYSIS

Mr. Campbell advances four reasons to dismiss the Indictment: 1) he cannot be prosecuted because § 666 cannot be applied extraterritorially; 2) application of § 666 extraterritorially violates his rights to due process; 3) prosecution of Mr. Campbell violates customary international law; and 4) the Indictment erroneously identifies him as an employee of

IOM, which he is not, and he is therefore not subject to prosecution under § 666. These will be addressed in turn.

## A. Extraterritoriality of Section 666

A statute applies extraterritorially when it reaches conduct occurring outside the territorial limits of the United States. The Indictment alleges criminal acts committed entirely beyond the borders of the United States – in Afghanistan – and the Government does not rely on any theory of territorial jurisdiction to support Mr. Campbell's prosecution. *See* Opp'n [Dkt # 22] at 5 n.3. Accordingly, the Government's prosecution under this Indictment depends upon the extraterritorial application of § 666.

Courts have long recognized a presumption against reading a statute to have extraterritorial effect. "It is a 'longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Morrison*, 130 S. Ct. at 2877 (quoting *EEOC v. Arabian Am. Oil Co.* ("*Aramco*"), 499 U.S. 244, 248 (1991) (superseded by Civil Rights Act of 1991, Pub. L. No. 102-166, § 105, 105 Stat. 1071)). "This principle represents a canon of construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate." *Id.* "It rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters." *Id.* Therefore, "unless there is the affirmative intention of the Congress clearly expressed" to give a statute extraterritorial effect, "we must presume it is primarily concerned with domestic conditions." *Aramco*, 499 U.S. at 248.

Despite this seemingly unequivocal pronouncement, the Supreme Court earlier cautioned that "the same rule of interpretation should not be applied to criminal statutes which are,

as a class, not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers or agents." *United States v. Bowman*, 260 U.S. 94, 98 (1922). Mr. Campbell urges the Court to follow the modern principle exemplified by *Morrison* and insist that the Government point to a textual basis in the statute to support the extraterritorial reach of § 666; the Government responds that *Bowman* has never been overruled or distinguished, that the alleged crime here constituted a fraud against the United States, and that the reasoning of *Bowman* applies four-square.

  *Bowman* concerned a criminal indictment charging "conspiracy to defraud a corporation in which the United States was and is a stockholder," *i.e.*, the United States Shipping Board Emergency Fleet Corporation, after defendants submitted a false claim for fuel oil for one of its steamships. 260 U.S. at 95. The plot was hatched at sea and at the port and city of Rio Janeiro, Brazil. *Id.* at 96. The district court concluded that the absence of any statutory reference to conduct at sea required it to construe the statute "not to extend to acts committed on the high seas." *Id.* at 97. On review, the Supreme Court reasoned:

> The necessary locus [of a crime], when not specifically defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations. Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and frauds of all kinds, which affect the peace and good order of the community, must of course be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard. . . .

But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents. Some such offenses can only be committed within the territorial jurisdiction of the Government because of the local acts required to constitute them. Others are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.

*Id.* at 97–98.

The criminal statute under which the *Bowman* indictment was brought was "directed generally against whoever presents a false claim against the United States, knowing it to be such, to any officer of the civil, military or naval service or to any department thereof, or any corporation in which the United States is a stockholder, or whoever connives at the same by the use of any cheating device, or whoever enters a conspiracy to do these things." *Id*. at 101. The statute had only recently been amended to proscribe false claims to corporations in which the U.S. was a stockholder, evidently to protect the Emergency Fleet Corporation which "was expected to engage in, and did engage in, a most extensive ocean transportation business and its ships were seen in every great port of the world open during the [First World War]." *Id.* at 102. The Court noted, "We can not suppose," under such circumstances, that Congress "did not have in mind that a wide field for such frauds upon the Government was in private and public vessels . . . beyond the land jurisdiction of the United States, and therefore intend to include them" in the statute's coverage. *Id.* The Court concluded that "[i]t needs no forced construction to interpret [the law] as we have done." *Id.*

The D.C. Circuit in *United States v. Delgado-Garcia* further explicated the analysis to determine the extraterritorial reach of criminal legislation. 374 F.3d 1337 (D.C. Cir. 2004). The alien defendants in *Delgado-Garcia* were charged with (1) conspiracy to encourage or induce aliens to come into the U.S. knowing that it would violate U.S. law and (2) attempt to bring unauthorized aliens into the U.S., in violation of various subsections of 8 U.S.C. § 1324. *Id*. at 1340, 1344. Defendants had been operating a sea vessel overcrowded with Ecuadorian nationals intending for the passengers to disembark in Mexico, and then enter the U.S. by land and without authorization. The boat was stopped by a U.S. Navy ship off the Guatemalan coast. Defendants abandoned the vessel and left their passengers to their fates; defendants were later indicted and pled guilty to crimes under § 1324(a)(1) and (a)(2), after protesting that they could not be prosecuted for acts outside the territory of the U.S. *See id*. at 1339–40.

The D.C. Circuit held that "[b]oth of these statutes apply extraterritorially." *Id*. at 1344. It explained that the presumption against extraterritorial application was overcome:

> This presumption against extraterritorial application of domestic statutes is based on the assumption that Congress is primarily concerned with domestic conditions. This presumption embodies sensible contextual linguistic reasons for reading the plain texts of domestic statutes not to apply everywhere in the world. Because Congress's primary arena of sovereignty is the territorial United States, it makes sense to presume, absent other evidence, that its commands linguistically apply only there. Therefore, we presumptively read the text of congressional statutes not to apply extraterritorially, unless there are contextual reasons for reading the text otherwise.
>
> . . . Contextual reasons, in our view, supply the "affirmative evidence" the Supreme Court requires to overcome the presumption.
>
> . . . [W]e agree with the Second Circuit's statement [in *Kollias v. D & G Marine Maintenance*, 29 F.3d 67, 71 (2d Cir. 1994)] . . . that "all

> statutes, without exception, [should] be construed to apply within the United States only, unless a contrary intent appears." Our point is that contextual factors show that Congress had a contrary intent in this case.

*Id.* (internal quotation marks and citations omitted). The presumption against extraterritorial enforcement reflects a "sensible caution" that is dependent on "contingent real-world assumptions." *Id*. at 1345. A court must not "read the statute based on the result of its own policy analysis," but "apply the canons of construction to interpret, not rewrite, congressional acts" and, in examining the text, should "consider both contextual and textual evidence." *Id.*

As to context, the Circuit noted that § 1324(a) is concerned with more than domestic conditions as it "protects the borders of the United States against illegal immigration" and would naturally "reach those outside the borders." *Id.* The statute's text supported the same conclusion because inducing an immigrant to enter the U.S. illegally and attempting to bring an immigrant into the U.S. illegally necessarily require the immigrant to be located initially outside the United States. The Circuit explained that it was very likely that the perpetrator of such a crime would be physically proximate to the immigrant in committing the crime. *Id*. at 1345–48. The Circuit further noted that the "language of § 1324(a) is distinctive, not boilerplate, and applies to a great many acts that one customarily would expect to occur overseas." *Id*. at 1348.

Mr. Campbell relies upon the Supreme Court's 2010 *Morrison* decision, and other similar cases, which require an "affirmative intention of the Congress clearly expressed" for a statute to have an extraterritorial effect. *See, e.g., Aramco*, 499 U.S. at 248. *Morrison* scolds those courts that engage in "judicial-speculation-made-law – divining what Congress would have wanted if it had thought of the situation before the court." 130 S. Ct. at 2881. The ensuing inconsistencies

"demonstrate the wisdom of the presumption against extraterritoriality." *Id*. "Rather than guess anew in each case, we apply the presumption *in all cases*, preserving a stable background against which Congress can legislate with predictable effects." *Id*. (emphasis added). "When a statute gives no clear indication of an extraterritorial application, it has none." *Id*. at 2878. Despite its emphasis, *Morrison* left room for some consideration of context beyond the statutory text alone. "[W]e do not say, as the concurrence seems to think, that the presumption against extraterritoriality is a 'clear statement rule,' if by that is meant a requirement that a statute say 'this law applies abroad.' Assuredly context can be consulted as well." *Id*. at 2883 (internal citation omitted).

As pertinent here, § 666 criminalizes the actions of an "agent" of an "organization" that receives more than $10,000 in federal benefits in a given year who "corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization . . . involving any thing of value of $ 5,000 or more." 18 U.S.C. § 666(a)(1)(B). The plain language of § 666 contains no direct or explicit grant of extraterritorial application.

Mr. Campbell's attack on the Government's extraterritorial application of § 666 presents two distinct questions: 1) can the Government prosecute a U.S. citizen for specific kinds of crimes against it, such as fraud, theft and bribery, when the acts occur in a foreign country but the criminal statute contains no "textual" reference to extraterritoriality and 2) can the Government prosecute a non-U.S. citizen for similar criminal acts?

The first question must be answered affirmatively. Not only does *Bowman* stand squarely for this proposition but there is some limited evidence that Congress knew of, and

approved, *Bowman*'s analysis. To begin, *Bowman* has not been overruled or explicitly limited by

any subsequent Supreme Court decision, and it has been cited and applied by circuit courts multiple

times in recent years. Only the Supreme Court has authority to overrule or vacate its decisions and

a lower court must not presume Supreme Court precedent has been limited or overruled absent

explicit indication. *See, e.g., Tenet v. Doe*, 544 U.S. 1, 10–11 (2005). Ultimately, if the "precedent

of this Court has direct application in a case, yet appears to rest on reasons rejected in some other

line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this

Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American

Express, Inc.*, 490 U.S. 477, 484 (1989). The Supreme Court has not limited or overruled *Bowman*.

Despite the emphasis of *Morrison* that the presumption against extraterritoriality

applies "in all cases," 130 S. Ct. at 2881, recent Supreme Court jurisprudence has developed with

nary a mention of *Bowman* and has predominately involved civil statutes.[3] No doubt courts do and

---

[3] Many courts since *Morrison* have continued to find that *Bowman* presents an exception to, or overcomes, the presumption against extraterritoriality, or have otherwise found no tension between the two cases. *See e.g.*, *United States v. Weingarten*, 632 F.3d 60, 65–67 (2d Cir. 2011) (acknowledging *Morrison* and then noting that, per *Bowman*, Congress is presumed to have intended the extraterritorial reach of criminal statutes where the nature of the crime is not dependent on the location of the acts and limiting the statute to U.S. territory would significantly diminish its effectiveness); *United States v. Belfast*, 611 F.3d 783, 811, 813–14 (11th Cir. 2010) (citing *Morrison* for the proposition that the presumption against extraterritoriality may only be overcome by clear expression of congressional intent, which may be inferred per *Bowman* from the nature of the offense and whether denying extraterritoriality would limit the scope and usefulness of the statute); *see also Doe v. Exxon Mobil Corp.*, No. 9-7125, 2011 U.S. App. LEXIS 13934, at *23 (D.C. Cir. July 8, 2011) (citing, without discussion, *Bowman* as support for *Morrison*'s holding that unless contrary congressional intent appears, legislation shall only apply to conduct within the territorial jurisdiction of the United States). Other courts have noted that *Bowman* has not been overruled or limited by subsequent caselaw. *See United States v. Leija-Sanchez*, 602 F.3d 797, 799 (7th Cir. 2010) (noting, in a pre-*Morrison* decision, that "[w]hether or not *Aramco* and other post-1922 decisions are in tension with *Bowman*, we must apply *Bowman* until the Justices themselves overrule it. . . . The Supreme Court has neither overruled *Bowman* nor suggested that the courts of appeals are free to reconsider its conclusion"); *United States v. Finch*, Crim. No. 10-333, 2010 U.S. Dist. LEXIS

-13-

should presume criminal laws to have only domestic application absent affirmative evidence to the contrary, *see, e.g., Delgado-Garcia*, 374 F.3d at 1344, but *Morrison*'s insistence on a textual foundation in the statutory language is not found in *Bowman*, which relied on the Supreme Court's perception of an implied congressional intent of extraterritoriality for a specific grouping of crimes against the U.S. government.

Second, § 666 falls precisely in line with the limited type of criminal statutes addressed in *Bowman*: "criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated." 260 U.S. at 98. The Supreme Court readily concluded that Congress had the authority to enact § 666 under the Necessary and Proper Clause of the Constitution, Art. I, § 8, cl. 18, "to see to it that taxpayer dollars . . . are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off." *Sabri v. United States*, 541 U.S. 600, 605 (2004). The statute's "design was generally to 'protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery.'" *Id*. at 606 (quoting S. REP. NO. 98-225, at 370 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3511). "Money is fungible, bribed officials are

---

104496, at *12 (D. Haw. Sept. 30, 2010) ("*Morrison* neither explicitly nor implicitly overrules *Bowman*, which counsels courts to examine statutes with an eye toward whether Congress intended to protect the Government from crimes wherever perpetrated.").

To be sure, a recent decision of this Court, *United States v. Philip Morris USA, Inc.*, reiterated *Morrison*'s command that the presumption against extraterritoriality be applied to all statutes. Civ. No. 99-2496, 2011 U.S. Dist. LEXIS 32053, at *23 (D.D.C. Mar. 28, 2011). The Court nonetheless noted that as "the Defendants' criminal enterprise does not implicate 'the right of the government to defend itself,' *Bowman* poses no obstacle to the proper application of *Morrison* here." *Id*. at *24 n.6 (quoting *Bowman*, 260 U.S. at 98).

untrustworthy stewards of federal funds, and corrupt contractors do not deliver dollar-for-dollar value." *Id*. "Section 666(a)(2) is authority to bring federal power to bear directly on individuals who convert public spending into unearned private gain." *Id*. at 608. Thus, the purpose of § 666 parallels that of the statute considered by the Supreme Court in *Bowman* and falls squarely within *Bowman*'s holding.

Similarly, other courts confronted with statutes criminalizing fraud or corruption against the United States have invoked *Bowman* to find the presumption against extraterritoriality inappropriate. In a matter involving the prosecution of U.S. citizens for theft of government property overseas under 18 U.S.C. § 641, the Ninth Circuit found the extraterritorial application of § 641 appropriate. Acknowledging that the statute did not "express the scope of its application," the Circuit found it nonetheless "inconceivable that Congress, in enacting Section 641, would proscribe only the theft of government property located within the territorial boundaries of the nation." *United States v. Cotten*, 471 F.2d 744, 750 (9th Cir. 1973). The Circuit applied *Bowman*'s rationale to § 641, recognizing that the "law certainly represents an exercise by the Government of its right to defend itself from obstructions and frauds." *Id*. Thus, the Ninth Circuit "conclude[d] that the enactment is a member of that class of proscriptions which is not logically dependent upon the locality of violation for jurisdiction," and which must have extraterritorial effect. *Id*.; *see also United States v. Ayesh*, 762 F. Supp. 2d 832, 839–40 (E.D. Va. 2011) (finding "the exercise of extraterritorial jurisdiction appropriate" for 18 U.S.C. §§ 641 and 208(a) – statutes criminalizing conversion and theft of federal financial assets and conflicts of interest in federal contracting – as "statutes targeting crimes primarily involving government personnel or assets because, consistent with *Bowman*, the nature of the offenses targeted makes the presumption against extraterritorial

jurisdiction inappropriate"); *United States v. Finch*, Crim. No. 10-333, 2010 U.S. Dist. LEXIS 104496, at *10–12 (D. Haw. Sept. 30, 2010) (invoking *Bowman* to find 18 U.S.C. § 201, prohibiting bribery or fraud committed against the United States or its officers, reached extraterritorial conduct).[4]

Aside from "the necessary implication of the statute," the Ninth Circuit in *Cotten* also found persuasive evidence that the criminal venue provisions of 18 U.S.C. § 3238 were amended to establish special venue in U.S. district courts for "all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district," 18 U.S.C. § 3238, "because certain criminal activity against the Government and prosecutable by the Government, including violations of Section 641, could be committed abroad, but prosecution avoided because of defects in the venue provision." *Cotten*, 471 F.2d at 750–51.[5] That the criminal venue statute

---

[4]  The Supreme Court noted that 18 U.S.C. § 201, the federal bribery law, and 18 U.S.C. § 641, the federal theft statute, had failed to safeguard adequately the federal purse from graft and bribery, and that in response, Congress enacted § 666 "thereby filling the regulatory gaps." *See Sabri*, 541 U.S. at 607. It was "Congress's decision to enact § 666 only after other legislation had failed to protect federal interests." *Id.*; *see also Salinas v. United States*, 522 U.S. 52, 58 (1997).

[5]  The Ninth Circuit cited 1963 U.S.C.C.A.N. 660 *et seq.*, part of the legislative history of 18 U.S.C. § 660. *Cotten*, 471 F.2d at 751 n.21. That reference contains Senate Report No. 88-146, favorably reporting H.R. 2842 to amend the venue statute at 18 U.S.C. § 3238. *See* S. REP. NO. 88-146, at 1 (1963), *reprinted in* 1963 U.S.C.C.A.N. 660, 660; *see also* H.R. 4842, 111th Cong. (2009). The Senate Committee on the Judiciary noted that the amendment would cure two defects which hampered prosecution of "Federal crimes committed outside the United States," which "have increased proportionately" "with the spread of U.S. interests overseas." S. REP. NO. 88-146, at 1. The amendment would permit indictment and trial of an offender or joint offenders in the district where any of them is arrested or first brought and would prevent the running of the statute of limitations when an offender is beyond the bounds of the United States. "Such crimes committed abroad may include treason, fraud against the Government, theft or embezzlement of Government property, bribery, etc., as well as conspiracy to commit such offenses." *Id.* The Senate Committee specifically commented that it was "satisfied that the enactment of this legislation will sustain and implement a decision of the Supreme Court of the United States in *United States v. Bowman*," which "held that citizens of the United States, while outside the United States, are subject to penal laws passed by the United States to protect itself and its property." *Id.* at 2.

§ 3238 was amended to aid the prosecutions foreseen by *Bowman*, with the Senate Judiciary Committee citing the operable language from *Bowman*, supports this conclusion. *See Bowman*, 260 U.S. at 102 (relying, in part, on the venue provision).

The answer to the first question presented by Mr. Campbell's motion is, therefore, that the United States can prosecute U.S. citizens who commit limited kinds of crimes against the government, including violations of § 666, even when those crimes are committed outside the nation's boundaries.

Whether such a prosecution can proceed against a non-U.S. citizen presents a more complex question. Mr. Campbell is an Australian citizen who was associated with the IOM in Afghanistan, awarding contracts to Afghani companies. He was apprehended in India. None of the events underlying his Indictment occurred in the United States or U.S. territory and he argues that there is no nexus between his alleged criminal activities and the United States, such as in *Bowman* where the defendants were U.S. citizens and arrested in New York. *See* Def.'s Reply [Dkt. # 23] at 3. The precise argument does not serve because the presence of the *Bowman* defendants in New York had nothing to do with their crime, although their U.S. citizenship was specially noted by the Court and, since then, by the Senate Committee on the Judiciary.

To be sure, *Bowman* addressed the prosecution of three defendants who were U.S. citizens, but noted that a fourth, "a subject of Great Britain," had not been apprehended. 260 U.S. at 102. The Court commented that "it will be time enough to consider what, if any, jurisdiction the District Court below has to punish him when he is brought to trial." *Id*. at 102–03. There is no record that the fourth defendant was ever apprehended or tried.

The D.C. Circuit, however, has already instructed that "the citizenship of the

defendants[] is irrelevant" because "*Bowman*'s logic did not depend on th[e] fact" that only U.S. citizen defendants were before the Court and that the ruling "was much more pointed than that." *Delgado-Garcia*, 374 F.3d at 1345–46; *see also Ayesh*, 762 F. Supp. 2d at 840 (finding *Bowman* applies equally to non-U.S. citizens). The D.C. Circuit found its "more pointed" logic in the Court's reference to Congress's extension of the fraud statute, "theretofore limited to government departments," to corporations in which the U.S. was a shareholder, clearly intending to protect the Emergency Fleet Corporation which was expected to, and did, engage in international business. *Delgado-Garcia*, 374 F.3d at 1346. Because many persons who would defraud the Emergency Fleet Corporation would clearly do so overseas, which is why the statute was given extraterritorial effect, the Circuit concluded that a lack of U.S. citizenship does not lessen *Bowman*'s force. *Id*. Mr. Campbell's alleged bribery was in connection with the payments of USAID monies, a federal agency which is expected to engage in, and does engage in, a most extensive international aid program. With such a similar basis, this Court finds it is bound by *Delgado-Garcia* to conclude that Mr. Campbell's status as a non-citizen of the United States does not bar his prosecution. It answers the second question posed above in the affirmative, based on these particular facts and precedents.

## B. Due Process

Mr. Campbell next argues that even if § 666 applies extraterritorially, his prosecution under § 666 violates his rights to due process under the Fifth Amendment to the U.S. Constitution, which provides that "[no] person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. X. Whether the test for due process in such a circumstance requires a "sufficient nexus" to the United States, commonly understood as real effects or consequences accruing in this country, or prosecution that is neither arbitrary or capricious has split

the circuits.

One line of cases reasons that "[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States so that such application would not be arbitrary or fundamentally unfair." *United States v. Davis*, 905 F.2d 245, 248–49 (9th Cir. 1990) (internal citation omitted); *see also United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003); *United States v. Mohammad-Omar*, 323 Fed. Appx. 259, 261 (4th Cir. 2009) (unpublished). These courts look for real effects or consequences accruing in the United States before they find such nexus. "The nexus requirement serves the same purpose as the 'minimum contacts' test in personal jurisdiction. It ensures that a United States court will assert jurisdiction over a defendant who 'should reasonably anticipate being haled into court' in this country." *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)); *see also Delgado-Garcia*, 374 F.3d at 1341 (explaining, without deciding, that even if due process requires a sufficient nexus, the indictment in that case "clearly alleged that appellants intended to smuggle aliens into the United States, thereby causing effects there" so that "there was no arguable *facial* constitutional infirmity in the indictment").

In contrast, several circuits require only that extraterritorial prosecution be neither arbitrary nor fundamentally unfair, and are not concerned with whether a sufficient nexus exists. *See, e.g., United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3rd Cir. 1993) (rejecting sufficient nexus test and noting there was "nothing fundamentally unfair" about the defendant's prosecution); *United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999) ("To satisfy due process, our application of the [criminal statute] must not be arbitrary or fundamentally unfair."); *United*

*States v. Suerte*, 291 F.3d 366, 375-77 (5th Cir. 2002) (rejecting sufficient nexus requirement). In many circumstances, to be sure, it may be that "[t]his difference is less real than apparent; the existence of a nexus is what makes the prosecution neither arbitrary nor fundamentally unfair." *United States v. Shahani-Jahromi*, 286 F. Supp. 2d 723, 728 n.9 (E.D. Va. 2003).

      The Indictment alleges that Mr. Campbell was engaged with IOM to determine CHEF project awards of USAID monies to rebuild Afghanistan; that he attempted to bribe a recipient of such awards, ABC, for steering contracts, paid for by the United States, to it; and that he wanted the money for his personal enrichment. Mr. Campbell is alleged to have demanded and received U.S. currency in payment for past awards of USAID funds to ABC and in furtherance of future such awards, if USAID were to provide additional monies. Given the allegations, Mr. Campbell understood that his ability to steer future awards depended on greater United States financing. These facts, presumed at the moment to be true, provide a sufficient nexus to the United States so that Mr. Campbell's prosecution here would be neither fundamentally unfair nor arbitrary. It was the promise of lucrative USAID-funded contracts that Mr. Campbell used to obtain a bribe from ABC, and it was this U.S.-financed benefit to IOM that Mr. Campbell used for his own personal enrichment. The Indictment further alleges that Mr. Campbell frankly spoke of his risks of prosecution and incarceration, and that he clearly understood the link between the contracts and United States financing. Mr. Campbell reasonably should have anticipated being haled into a court in the United States.

      Whether a "sufficient nexus" or "arbitrary or fundamentally unfair" test is used on these facts, Mr. Campbell's prosecution meets the requirements of the Due Process Clause. His actions directly implicated American interests in preserving the integrity of its vast sums of donated

monies to be free from corruption, bribery and fraud.  *See Yousef*, 327 F.3d at 112 (finding no due process violation because "it cannot be argued seriously that the defendants' conduct was so unrelated to American interests as to render their prosecution in the United States arbitrary or fundamentally unfair"); *see also United States v. Brehm*, Crim. No. 11-11, 2011 U.S. Dist. LEXIS 33903, at *16–17 (E.D. Va. Mar. 30, 2011) (finding no due process violation because defendant's conduct directly impacted United States's interests in Afghanistan).  Not only might Mr. Campbell's actions hold the United States up to opprobrium in Afghanistan, every instance of such connivance robs USAID money from its intended purpose, hinders the United States's substantial efforts in Afghanistan, and also robs USAID of support for its efforts from the U.S. taxpayer.  To make up funds so mis-directed, Congress must appropriate additional funds.  The impact on the purse, purpose and reputation of the United States government is clear.

   The Court can find no violation of Mr. Campbell's due process rights.

### C.  International Law

   Mr. Campbell argues that his prosecution violates customary international law.[6] Customary international law proffers bases for the exercise of legislative jurisdiction, which is transgressed when jurisdiction is asserted beyond such bases or in breach of a specific legal limitation.  "[I]nternational law itself imposes limits on the extraterritorial jurisdiction that a domestic court may exercise.  It generally recognizes five theories of jurisdiction, the objective

---

[6] Whereas the presumption against "extraterritoriality" speaks to the principle that Congress generally does not intend U.S. laws to apply within the territorial jurisdiction of another nation, the present argument, in effect, invokes the presumption against "extrajurisdictionality," that is, "a presumption that federal law does not extend beyond the jurisdictional limits set by international law."  John H. Knox, *A Presumption Against Extrajurisdictionality,* 104 AM. J. INT'L L. 351, 352 (2010).

territorial, national, passive, protective and universal." *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 781 n.7 (D.C. Cir. 1984). These five general principles are:

> *Territorial*, wherein jurisdiction is based on the place where the offense is committed;
>
> *National*, wherein jurisdiction is based on the nationality of the offender;
>
> *Protective*, wherein jurisdiction is based on whether the national interest is injured;
>
> *Universal*, wherein jurisdiction is conferred in any forum that obtains physical custody of the perpetrator of certain offenses considered particularly heinous and harmful to humanity; and
>
> *Passive personal*, wherein jurisdiction is based on the nationality of the victim.

*United States v. Yunis*, 681 F. Supp. 896, 899–900 (D.D.C. 1988). An act of Congress should not be construed in a manner that violates the laws of nations if a non-violative interpretation is possible. *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 815 (1993) ("Though it clearly has constitutional authority to do so, Congress is generally presumed not to have exceeded those customary international-law limits on jurisdiction to prescribe.").

Here, the protective principal – specifically articulated in *Bowman*[7] – supports the prosecution of Mr. Campbell. "The protective principle permits a nation to assert jurisdiction over a person whose conduct outside the nation's territory threatens the nation's security or could potentially interfere with the operation of its governmental functions." *United States v. Romero-Galue*, 757 F.2d 1147, 1154 (11th Cir. 1985); *see also United States v. Alomia-Riascos*, 825 F.2d

---

[7] *Bowman*, 260 U.S. at 102 (approving prosecution for overseas criminal conduct under "such laws as [the United States] might pass to protect itself and its property").

769, 771 (4th Cir. 1987) ("The protective principle of international law permits a nation to assert subject matter criminal jurisdiction over a person whose conduct outside the nation's territory threatens the national interest.").  "The protective principle does not require that there be proof of an actual or intended effect inside the United States.  The conduct may be forbidden if it has a potentially adverse effect and is generally recognized as a crime by nations that have reasonably developed legal systems."  *United States v. Gonzalez*, 776 F.2d 931, 939 (11th Cir. 1985).

Bribery in connection with contracts backed by U.S. financing is illegal precisely because it implicates and adversely affects the interests and purse of the United States.  The United States has the right "to defend itself against obstruction, or fraud wherever perpetrated."  *Bowman*, 260 U.S. at 98; *see also Ayesh*, 762 F. Supp. 2d at 841 (finding protective principle justified prosecution because statutes "which target government theft and corruption, certainly advance an important national interest that cannot be understated").  The protective principle amply supports prosecution of Mr. Campbell in this Court.

### D.  Defendant as Agent

Finally, Mr. Campbell challenges the accuracy of the factual allegations of the Indictment, most particularly its reference to him as an "agent" of IOM.  He asserts that he was an employee of the Christian Thomas Group Global, a private business entity from the British Virgin Islands, and not employed by IOM at all.  Thus, he argues, he cannot be prosecuted as an agent of IOM or, in the statutory terms, an agent of an organization that receives federal funds.

This argument cannot be resolved on the face of the Indictment and, even if accurate in fact, is not necessarily complete or accurate at law.  First, the Court must assume the facts alleged in the Indictment are true at this stage of the proceedings and there is nothing on the face of the

Indictment to support Mr. Campbell's argument. An indictment need only contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). An indictment does not need to put forth all evidence the Government plans to present. *United States v. Ring*, 628 F. Supp. 2d 195, 204 (D.D.C. 2009). Instead, "at the pretrial stage, the indictment ordinarily should be tested solely by its sufficiency to charge an offense, regardless of the strength or weakness of the government's case." *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988) (citing *United States v. Sampson*, 371 U.S. 75, 78–79 (1962)). It would be, at best, an "unusual circumstance" for a "district court to resolve the sufficiency of the evidence before trial because the government is usually entitled to present its evidence at trial and have its sufficiency tested by a motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure." *United States v. Yakou*, 428 F.3d 241, 247 (D.C. Cir. 2005). The Court finds no such unusual circumstance here.

In addition, as a matter of law, Mr. Campbell might be found to have occupied a role in which he exerted such control or power with regard to IOM and CHEF contracts that he constituted an IOM "agent" for current purposes even if he were not technically an IOM employee. Section 666(d)(1) defines "agent" broadly, as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1); *United States v. Sotomayor-Vazquez*, 249 F.3d 1, 8 (1st Cir. 2001) (finding that "the inclusion of 'employee' in the statutory language as a separate qualification suggests that the definition of agent includes 'directors,' 'managers,' and 'representatives' who are not technically employees"). Certainly, there is no way currently to reach any such conclusion, but the possibility alone that the Government could

demonstrate that Mr. Campbell acted as an agent of IOM dooms his motion to dismiss based on his asserted non-employment with IOM because the statute is not limited to employees.

Inasmuch as this portion of the motion to dismiss rests on contested facts, it cannot be determined at this time and will be denied without prejudice.

## IV. CONCLUSION

The Court concludes that Defendant's alleged violation of 18 U.S.C. § 666(a)(1)(B) in a foreign country may be prosecuted in this country without violating the principle against extraterritorial application of U.S. law, Defendant's due process rights, or customary international law. The motion to dismiss the Indictment based on these legal arguments will be denied. The motion to dismiss based on arguments that Mr. Campbell was not an "agent" of an organization receiving USAID funds will be denied without prejudice as premature at this stage of the proceedings. A memorializing Order accompanies this Memorandum Opinion.

Date:   July 27, 2011                          _____/s/_____
                                               ROSEMARY M. COLLYER
                                               United States District Judge